[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 22, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-12328

_____

D. C. Docket No. 06-00680-CV-IPJ

KEVIN DANLEY,

Plaintiff-Appellee,

versus

RUBY ALLEN,

Defendant,

JACKIE RIKARD,
RONNIE WILLIS,
RUBY ALLYN,
JEFF WOOD,
STEVE WOODS,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(August 22, 2008)**

Before BLACK and CARNES, Circuit Judges, and RESTANI,[*] Judge.

CARNES, Circuit Judge:

Kevin Danley was arrested for driving under the influence and was taken to jail. While there he had a disagreement with some of the jailers after he was made to use a dirty toilet without any toilet paper. Because Danley failed to obey one of the jailer's orders during the disagreement, another jailer pepper sprayed him. Although pepper spray is an accepted non-lethal means of controlling unruly inmates, Danley contends that the jailers used too much on him, that he was not allowed to wash it off after he calmed down, and that he was denied adequate medical care following the incident. He says he suffered, and he has sued.

Kevin Danley, who had been locked up in the Lauderdale County Detention Center, filed his lawsuit under 42 U.S.C. § 1983, claiming that he was subjected to excessive force and deliberate indifference, both in violation of the Fourteenth Amendment. He named as defendants Ruby Allyn, Jeff Wood, and Steve Woods, who are jailers; Jackie Rikard, the jail administrator; and Ronnie Willis, the sheriff. The central allegations in Danley's complaint are that after he was pepper sprayed at the jail, he was locked in a poorly ventilated cell, prevented from washing off

---

[*] Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

the pepper spray, and denied medical care that he needed as a result of the spraying.

After the district court denied the defendants' motions to dismiss the complaint on qualified immunity grounds, they appealed. We vacated and remanded for further consideration and findings. Danley v. Allen, 480 F.3d 1090, 1092 (11th Cir. 2007). The district court made more findings about the evidence, denied the motions to dismiss again, and the defendants have appealed again.

## I.

For now, we take the facts alleged in the complaint as true and construe them in the light most favorable to Danley. Pielage v. McConnell, 516 F.3d 1282, 1284 (11th Cir. 2008). In that light the facts are that on July 11, 2004 Danley was arrested for driving under the influence and taken to the Lauderdale County, Alabama Detention Center. Once there he was put in a group cell that had no toilet. After asking the jailers several times to use a toilet, Danley was eventually taken "to a small cell (~5 x 7) that had a toilet in the corner and no water." He complained that the toilet was unsanitary and there was no toilet paper, and he told Allyn he needed some in order to "clean the 'nasty' toilet so he could sit down." She refused his request.

After Danley finished using the toilet, jailers Allyn, Wood, and Woods began to take him from the small cell back to the larger group cell. Danley was still upset about the lack of toilet paper and asked them "if he could please have some 'fucking' or 'damn' toilet paper to wipe himself." Allyn told Danley to watch his language, to shut up, and to get back into the small cell. Danley replied that he was done using the toilet, and Allyn told him that if he did not get back in the small cell "she was going to spray him." Danley then asked Allyn why she was "fucking" with him and what "spray me" meant. Instead of answering the second part of Danley's question, Allyn decided to show him what she meant. She told Wood to pepper spray Danley, and Wood sprayed him "at close range" for three to five seconds.

Wood and Woods then pushed Danley back into the small cell and closed the door. Because Danley had been in the doorway of the cell when he was sprayed, the spray remained not only on him and his clothes but also in the air of the small, poorly ventilated cell. Danley began having trouble breathing, started to hyperventilate, screamed and cried to the three jailers that he could not breathe, and begged to be let out. The effects were so severe that he "feared he was going to die." In response to his pleas for help, the jailers laughed at Danley and made fun of him; among other things, Wood and Woods held their hands to their necks

4

in a "mock-choking" gesture.  They also told Danley that "if he did not shut up he would not be let out."

After ten minutes, Danley quieted down.  Still, the three jailers left him in "the small, poorly ventilated cell for approximately 20 minutes," doing nothing to help him while he was suffering.  Finally, they took him out of the cell and to a shower, where he was allowed to rinse off.  His shower, however, was less than two minutes long, which "did not permit him adequate time for effective decontamination."  The jailers then returned Danley to the group cell, which like its smaller counterpart was also insufficiently ventilated.  Because he had not been permitted to adequately decontaminate himself, pepper spray still clung to Danley and his clothes.  Within thirty minutes of being placed in the group cell, Danley's cellmates began complaining that their eyes were burning because of the residue left on him.

Danley also continued to suffer the effects of the pepper spray once he was back in the group cell.  He had difficulty breathing, which he complained about to the jailers for the remainder of his time in the jail.  His eyes continued to burn and swelled so badly he could hardly see.  Danley's symptoms got so bad that in an attempt to relieve his suffering he laid down on the floor to breathe through the crack under the cell door.  Although he repeatedly requested medical treatment, the

5

jailers refused to let him see the jail nurse. At one point Danley "almost blacked out because of the breathing difficulties he had been having for the prior twelve-plus hours." According to the allegations in Danley's complaint, the three jailers "intentionally did not comply with jail policy and procedure and manufacturer instructions regarding ventilation and decontamination in order to inflict unnecessary and wanton pain and suffering on" him.

It was not until after another inmate intervened on Danley's behalf that he was taken to another cell that was better ventilated, but he was still not given any medical treatment. Finally, after a total of twelve to thirteen hours of suffering, Danley was released from the jail. He went to his doctor, who treated him for chemical conjunctivitis in his eyes and irritant-induced bronchospasms in his lungs and prescribed him "appropriate medication." Danley's injuries caused him to miss a day of work.

Danley complained about what had happened to him to Rikard, the jail administrator, and to Sheriff Willis. After "reviewing the circumstances" they "ratified and approved" what the three jailers had done to him. According to Danley, before this incident Rikard and Willis knew through "force reports and similar documents, inmate complaints, jailer complaints, attorney complaints, judicial officer complaints, and personal observation" that their jailers regularly

6

punished inmates by denying them adequate ventilation, decontamination, and medical care after they were pepper sprayed. There was a "de facto jail policy" permitting that. And jailers who "engag[ed] in this pattern of abuse," including Allyn, Wood, and Woods, "were not disciplined for their actions or provided with additional training."

After his complaints were ignored by the jail administrator and sheriff, Danley filed this 42 U.S.C. § 1983 lawsuit. His complaint alleges against Allyn, Wood, and Woods claims of excessive force and deliberate indifference in violation of the Fourteenth Amendment. It also seeks to have Rikard and Willis held liable in their individual capacities for those violations under a theory of supervisory liability.

The defendants responded with Rule 12(b)(6) motions to dismiss on qualified immunity grounds, which the district court denied without any explanation. On the defendants' appeal, we vacated the district court's orders denying the motions to dismiss and remanded with instructions for the court "to consider the case in full and to enter reasoned orders which discuss the facts alleged in the . . . complaint and detail the legal analysis used by the district court to reach its conclusions regarding the motions to dismiss." Danley, 480 F.3d at 1092.

7

On remand, the district court again denied the defendants' motions to dismiss Danley's complaint. In its memorandum opinion, the court explained that the decision in Hudson v. McMillian, 503 U.S. 1, 112 S. Ct. 995 (1992), had "provided more than 'fair warning' to all of these defendants that to employ pepper spray as punishment, or for the sadistic pleasure of the sprayers, as distinguished from what is reasonably necessary to maintain prisoner control, is constitutionally prohibited." With respect to Rikard and Willis, the district court stated that "Danley has done a creditable job of alleging facts and circumstances to show that [they] created an atmosphere or practice under which the three hands-on employees operated in, and that can create supervisory liability." The defendants have appealed again.

## II.

As to Danley's excessive force claim, jailers Allyn, Wood, and Woods contend that the district court erred by denying their motion to dismiss on qualified immunity grounds. Qualified immunity shields public officials in their individual capacities from some lawsuits against them arising from torts committed while they are performing a discretionary duty. Goebert v. Lee County, 510 F.3d 1312, 1329 (11th Cir. 2007). No one disputes that Allyn, Wood, and Woods' interactions with Danley occurred while they were engaged in discretionary duties. To

8

overcome the defense of qualified immunity, a plaintiff must show a constitutional or statutory violation and also that the right violated was clearly established at the time. Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). The defendants argue that Danley has not alleged a constitutional violation and, even if he has, the right they allegedly violated was not clearly established.

There are a number of different types of claims that arise under the Eighth Amendment's cruel and unusual punishment clause, including distinct claims for basic cruel and unusual punishment, for excessive force against prisoners, and for deliberate indifference to prisoners' serious medical needs. Courts apply a different test to each. See, e.g., Kelley v. Hicks, 400 F.3d 1282, 1284 (11th Cir. 2005) (applying the test for an Eighth Amendment deliberate indifference violation); Skrtich v. Thornton, 280 F.3d 1295, 1300–01 (11th Cir. 2002) (applying the test for an Eighth Amendment excessive force violation); Hope v. Pelzer, 240 F.3d 975, 978 & n.7 (11th Cir. 2001) (applying the test for an Eighth Amendment basic cruel and unusual punishment violation), rev'd on other grounds, 536 U.S. 730, 122 S. Ct. 2508 (2002). Pretrial detainees, who are not protected by the Eighth Amendment, can bring the same claims under the Fourteenth Amendment. See Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005) ("[I]t makes no

9

difference whether [the plaintiff] was a pretrial detainee or a convicted prisoner because 'the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving . . . pretrial detainees.'" (omission in original) (citation omitted)).

The defendants question whether Danley's asserted constitutional violation is actually a single Fourteenth Amendment excessive force claim, as his complaint alleges, or both an excessive force claim and a Fourteenth Amendment basic cruel and unusual punishment claim. The defendants contend that only Danley's initial spraying should be considered under the test for excessive force claims. His twenty-minute confinement in the poorly ventilated cell, the defendants argue, should be considered under the test for basic cruel and unusual punishment claims.

"The plaintiff is the master of the complaint. The plaintiff selects the claims that will be alleged in the complaint." United States v. Jones, 125 F.3d 1418, 1428 (11th Cir. 1997). At the Rule 12(b)(6) stage, Danley is entitled to have the Court consider both the spraying and the twenty minutes of confinement in the small, poorly ventilated cell as a single claim of excessive force if "the allegations in the complaint" can possibly be considered as such "in the light most favorable to [him]." Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007) (citations

10

omitted).  Viewed in that light, the spraying and twenty-minute confinement immediately thereafter can be seen as a single excessive force claim.

In Skrtich, we held that "the force administered by each defendant in [a] collective beating" should not "be analyzed separately to determine which of the defendants' blows, if any, used excessive force."  Skrtich, 280 F.3d at 1302.  The use of the pepper spray against Danley immediately followed by confinement in a small, poorly ventilated cell, which enhanced the effects of the spray, is analogous to two blows in a beating.  The nearly simultaneous actions are interrelated parts of a single course of conduct, not separate events.  Although we have parsed individual acts in a single sequence of events into separate claims in some cases, we have done so at the plaintiff's request.  See, e.g., id. at 1301–02; Williams v. Cash, 836 F.2d 1318, 1319 (11th Cir. 1988).  Danley has not asked us to do that, and it is his complaint that we are construing in the light most favorable to him.

Whether a jailer's use of force is excessive, and thus violates the inmate's Fourteenth Amendment right to be free from cruel and unusual punishment, depends on whether the jailer's act "shocks the conscience," Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007), and it necessarily will if the force "'was applied . . . maliciously and sadistically for the very purpose of causing harm.'"  Id. (quoting Whitley v. Albers, 475 U.S. 312, 320–21, 106 S. Ct. 1078, 1085 (1986)).

11

To evaluate whether actions shock the conscience, we consider the following factors: (1) the need for force; (2) the relationship between that need and the amount of force used; and (3) the extent of the resulting injury. Whitley, 475 U.S. at 321, 106 S. Ct. at 1085. In addition to those three factors we consider as fourth and fifth factors "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible official on the basis of facts known to them, and any efforts made to temper the severity of a forceful response." Id. When we consider whether the jailers' use of force was excessive, we must "give a wide range of deference to prison officials acting to preserve discipline and security." Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990).

If there were nothing before us but the initial use of pepper spray following Danley's second failure to obey Allyn's order to return to the cell, we would readily conclude that there was no Fourteenth Amendment violation. "Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." Id. After Danley twice disobeyed her commands, Allyn ordered Wood to spray him with pepper spray. Wood sprayed Danley for "approximately 3–5 seconds," and Wood and Woods then pushed Danley back into the cell and closed the door. Pepper spray is an accepted non-lethal means of controlling unruly inmates. See Jones v. Shields,

12

207 F.3d 491, 496 (8th Cir. 2000) (citing cases); cf. Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002).

And prison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out. Certainly they are not required to do so where an inmate repeatedly fails to follow those orders. Under the first factor, "[t]he need for the use of force [was] established by the undisputed evidence that [the inmate] created a disturbance." Bennett, 898 F.2d at 1533.

The second Whitley factor, the relationship between the need for force and the amount of force, also weighs against finding a constitutional violation. A short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders. See Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002) (holding that the use of two five-second bursts of pepper spray was not excessive when used to break up a fight among inmates after they had repeatedly ignored verbal commands to stop); Jones, 207 F.3d at 495–97 (holding that the use of a type of pepper spray called capstun against a prisoner was not a violation of the Eighth Amendment when he had disobeyed a supervisor's order and then questioned a guard's order); see also Baldwin v. Stalder, 137 F.3d 836, 838, 841 (5th Cir. 1998) (holding that jail guards did not use excessive force when they sprayed a two-second burst of chemical mace into a bus filled with prisoners who

13

had continued jumping on the seats, spitting at officers outside the bus, rocking the bus, and otherwise causing a disturbance after three times being told to stop); Williams v. Benjamin, 77 F.3d 756, 762–63 (4th Cir. 1996) (holding that the use of chemical mace was not excessive when a prisoner disobeyed an order to stop throwing water at a guard and then questioned the guard's second order to remove his arm from his cell's food service window); cf. Vinyard, 311 F.3d at 1348 ("Courts have consistently concluded that using pepper spray is reasonable . . . where the plaintiff was . . . refusing police requests.").

Nor does the third Whitley factor—the extent of Danley's injury from the initial use of pepper spray—favor finding a constitutional violation. Pepper spray "is designed to disable a suspect without causing permanent physical injury. Indeed, pepper spray is a very reasonable alternative to escalating a physical struggle . . . ." Vinyard, 311 F.3d at 1348 (internal quotation marks and citations omitted). Any injuries or discomfort Danley suffered as a necessary result of a dose of pepper spray were neither substantial nor long lasting.

The fourth Whitley factor, which requires an assessment of "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible official on the basis of facts known to them," Whitley, 475 U.S. at 321, 106 S. Ct. at 1085, does not support a finding of a constitutional violation when applied to the

14

initial use of the pepper spray. Because, as we discussed in light of the first and second Whitley factors, Danley created a disturbance by failing to obey orders, and the jailers' initial use of pepper spray was a reasonable response to that threat.

The only Whitley factor that would point toward the initial use of pepper spray being unconstitutional is that by confining Danley in a small cell and not permitting him to do anything to decontaminate himself after he had calmed down, the jailers did not do enough to "temper the severity of [their] forceful response." Whitley, 475 U.S. at 321, 106 S. Ct. at 1085. This factor brings up the remainder of the jailers' conduct, which amounted to a continuation and aggravation of the initial force applied to Danley after the need for force had ended.

Although the initial pepper spraying itself was not excessive force, this is not a case in which a jailer simply sprayed an inmate who had repeatedly failed to obey commands. Danley's complaint groups together the initial spraying and the subsequent twenty-minute confinement as a single instance of excessive force. Although less common than the direct application of force, subjecting a prisoner to special confinement that causes him to suffer increased effects of environmental conditions—here, the pepper spray lingering in the air and on him—can constitute excessive force. See Williams, 77 F.3d at 765 (holding that there was a constitutional violation under Whitley if guards "spray[ed] an inmate in the face

15

with mace and then confine[d] him in four-point restraints for an extended period of time without permitting him to wash or use the toilet, without fumigating the cell, and without allowing him the benefit of medical attention of any kind"); see also Burchett v. Kiefer, 310 F.3d 937, 945 (6th Cir. 2002) (holding that confining the plaintiff, an arrestee, in a "police car with the windows rolled up in ninety degree heat for three hours constituted excessive force" in violation of the Fourth Amendment).  This circumstance is to be distinguished from environmental conditions that generally affect the inmates in the jail, which are analyzed as conditions of confinement claims.  See, e.g., Helling v. McKinney, 509 U.S. 25, 35, 113 S. Ct. 2475, 2481 (1993) (holding that a prisoner can state an Eighth Amendment cruel and unusual punishment claim if jailers are deliberately indifferent to the effects of environmental tobacco smoke).

When jailers continue to use substantial force against a prisoner who has clearly stopped resisting—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive.  See Bozeman, 422 F.3d at 1272 (giving special weight to the fact that the jailers "continued [to] use . . . force in a manner that was severe enough to render [the plaintiff], at the very least, unconscious after [he] had surrendered"); Skrtich, 280 F.3d at 1303 ("[G]overnment officials may not use gratuitous force

16

against a prisoner who has been already subdued or, as in this case, incapacitated."); see also Harris v. Chapman, 97 F.3d 499, 505–06 (11th Cir. 1996); Davis v. Locke, 936 F.2d 1208, 1212–13 (11th Cir. 1991); Williams v. Cash-C.O.I., 836 F.2d 1318, 1320 (11th Cir. 1988); Perry v. Thompson, 786 F.2d 1093, 1093–95 (11th Cir. 1986); cf. Vinyard, 311 F.3d at 1348. Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need.

Pepper spray is "designed to disable a suspect," Vinyard, 311 F.3d at 1348 (internal quotation marks and citation omitted), by causing "intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx," Headwaters Forest Def. v. County of Humboldt, 240 F.3d 1185, 1199–1200 (9th Cir. 2000), vacated on other grounds, 534 U.S. 801, 122 S. Ct. 24 (2001). It sometimes also causes "disorientation, anxiety, and panic" in the person sprayed. Id. at 1200 (internal quotation marks omitted). Those effects are inherent in most, if not all, uses of pepper spray. That is how it achieves its purpose. Reading the complaint in the light most favorable to Danley, the pepper spray had its intended effect; it disabled Danley before the jailers pushed him back into the small cell. Given that he was disabled, there was no need for the jailers to continue using force after spraying

17

him. The use of force in the form of extended confinement in the small, poorly ventilated, pepper spray-filled cell, when there were other readily available alternatives, was excessive.

Our conclusion that, at least under the facts alleged in the complaint, Allyn, Wood, and Woods acted "maliciously and sadistically for the very purpose of causing harm," Whitley, 475 U.S. at 320–21, 106 S. Ct. at 1085, is supported by their actions after they made Danley's suffering worse by confining him in the small, pepper spray-filled cell. They mocked Danley while he suffered, parodying his choking, which is circumstantial evidence of their malicious intent. See Bozeman, 422 F.3d at 1272 n.11 (noting that threatening language "can be relevant to . . . the determination of reasonable inferences about the Officers' subjective state of mind"). We also look to "efforts made to temper the severity of [the] forceful response" as circumstantial evidence of whether the force was used maliciously. Whitley, 475 U.S. at 321, 106 S. Ct. at 1085. Although Allyn, Wood, and Woods eventually did permit Danley to shower, they did not allow him the amount of time required by jail policy. This inadequate measure to ameliorate the effects of putting him in the small, unventilated cell weighs against concluding that the jailers put him in that cell and left him there for twenty minutes in "a good faith effort to maintain or restore discipline." Id. at 320, 106 S. Ct. at 1085.

18

Having established a constitutional violation, the next step in the qualified immunity analysis usually is to determine whether the right was clearly established. See Saucier, 533 U.S. at 201, 121 S. Ct. at 2156. However, we have held that "there is no room for qualified immunity" in Eighth and Fourteenth Amendment excessive force cases because they require a subjective element that is "so extreme" that no reasonable person could believe that his actions were lawful. Johnson v. Breeden, 280 F.3d 1308, 1321–22 (11th Cir. 2002). As a result, we conclude that the district court did not err by denying the defendants' motions to dismiss Danley's excessive force claim on qualified immunity grounds.

**III.**

Allyn, Wood, and Woods next contend that the district court erred by denying their motions to dismiss Danley's deliberate indifference claim based on qualified immunity. Danley's complaint alleges that the jailers acted with deliberate indifference to his serious medical needs when they refused to allow him to adequately decontaminate himself and to see the jail nurse.

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. See Goebert, 510 F.3d at 1326. Under the Fourteenth Amendment, pretrial detainees are afforded the same protection. See id. To prove a deliberate indifference claim, a plaintiff must show: (1) a serious medical need;

19

(2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury. Id. The defendants contend that Danley has not properly alleged either a serious medical need or deliberate indifference to it.

There are at least two different tests for whether a medical need is serious. See Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187–88 (11th Cir. 1994), overruled in part on other grounds by Hope, 536 U.S. at 739 n.9, 122 S. Ct. at 2515 n.9. We need not decide when it is appropriate to use one and when the other because Danley's medical need was serious under either. One test is whether a delay in treating the need worsens it. Id. at 1188. In his complaint, Danley alleges that he would not have suffered any lingering effects from the pepper spray if he had been allowed to fully decontaminate himself. He also alleges that he almost blacked out more than twelve hours after he had been sprayed as a cumulative result of his breathing problems during all of that time. Finally, Danley alleges that the chemical conjunctivitis and bronchospasms he suffered were the result of the delay in treatment. We conclude that Danley has alleged a serious medical need under this test. See Harrison v. Barkley, 219 F.3d 132, 137 (2d Cir. 2000) (holding that even a tooth cavity can become a serious medical need because it

"will degenerate with increasingly serious implications if neglected over sufficient time").

The other measure of whether a medical need is serious enough to satisfy the first element of a deliberate indifference claim is if the need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill, 40 F.3d at 1187 (internal quotation marks and citation omitted). The defendants rely on this definition in arguing that Danley did not have a serious medical need, but we conclude that Danley has alleged a serious medical need under this test as well. As we have mentioned, Danley alleges that he had difficulty breathing, that his eyes burned and became so swollen he could hardly see, and that more than twelve hours after he had been sprayed he nearly blacked out as a result of all his breathing problems. Danley repeatedly asked to see the jail nurse, and when the jailers refused to allow him to do so, "another inmate intervened on his behalf with [the] jailers." That Danley needed medical attention was apparent enough for another inmate to recognize it and try to get help for Danley is a fact weighing in favor of finding deliberate indifference, although it may not be entitled to substantial weight.

In <u>Adams v. Poag</u>, 61 F.3d 1537 (11th Cir. 1995), we stated that a prisoner's chronic asthma, which resulted in frequent asthma attacks, constituted a serious medical need. <u>Id.</u> at 1539–40, 1543. Danley's allegations about his inability to breathe and his bronchospasms essentially describe an asthma attack. <u>See</u> 1 J.E. Schmidt, M.D., <u>Attorneys' Dictionary of Medicine and Word Finder</u> A–572 (Matthew Bender & Co., Inc. 2007) (defining "asthma" as "[a] condition characterized by recurring attacks of dypsnea (shortness of breath), a feeling of pressure on the chest, wheezing, cough, fear, etc."). While the plaintiff in <u>Adams</u> allegedly suffered only breathing difficulties, Danley alleges that he suffered both breathing problems and eye irritation and swelling from the prolonged exposure to pepper spray. If the plaintiff in <u>Adams</u> stated a serious medical need, as we held he did, then Danley does as well.

The defendants argue that pepper spray does not create a serious medical need because it causes "only temporary discomfort." That is usually true. The serious medical needs Danley alleges, however, are the effects of prolonged exposure to pepper spray with inadequate decontamination and poor ventilation, not the immediate effects of the pepper spray. In addition to pain, Danley has alleged that he suffered chemical conjunctivitis and bronchospasms because of the delay in treatment. Finally, we have recognized that, while not all pain will

constitute a serious medical need, see Hill, 40 F.3d at 1187–88, "prison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain," McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999). If failing to treat pain can violate the Eighth Amendment, then it can violate the Fourteenth as well. See Goebert, 510 F.3d at 1326.

The defendants also argue that Danley did not have a serious medical need because the appropriate treatment for pepper spray is merely a shower. That argument misses the point of Danley's allegations, which is that the jailers forced Danley to wait for too long before allowing him to shower and the shower that finally was allowed was too short to treat the injury. The allegation is that, as a result, Danley suffered needless pain, breathing problems, and inflamed eyes. If an adequate shower is the only treatment that is required, then an adequate shower is required.

Defendants Allyn, Wood, and Woods next contend that their failure to let Danley see the jail nurse cannot be deliberate indifference. According to them, because the normal treatment for pepper spray is merely a shower, medical attention is not necessary. Therefore, they argue, they could not have been deliberately indifferent by not permitting Danley to see the jail nurse. This is less an intent argument than a re-working of their earlier argument that Danley did not

23

have a serious medical need because the only treatment he needed was a good shower. To the extent this is an intent argument, it fails.

To establish the intent element of a deliberate indifference claim, a "[p]laintiff must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Bozeman, 422 F.3d at 1272 (second alteration in original) (internal quotation marks and citation omitted). Danley has alleged facts meeting all three elements.

Reading Danley's complaint in the light most favorable to him, Allyn, Wood, and Woods were aware of a risk of serious harm from the prolonged exposure to pepper spray that would result from failing to decontaminate Danley. Danley alleges that they knew about these effects, and he supports that contention with allegations about the basis of their knowledge. First, Danley alleges that "[j]ail policy and procedure . . . provide for inmates upon whom pepper spray has been used to be provided with prompt and adequate ventilation and decontamination to . . . prevent injury from prolonged exposure." It is reasonable to infer at this stage in the proceedings that, as jail employees, Allyn, Wood, and Woods were aware of those policies and procedures. Second, the three of them allegedly knew that Danley was actually suffering "injury from prolonged

24

exposure" because they "heard [his] pleas for help and requests for medical treatment." Finally, Danley has alleged that the jailers also heard the complaints from other inmates in the group cell that their eyes were burning just from being near Danley. It is reasonable to infer from this that the jailers must have known that Danley, who still had pepper spray clinging to him, would be suffering as much or more.

Allyn, Wood, and Woods allegedly disregarded Danley's serious medical need by failing to provide him a shower that was anywhere near long enough to fully decontaminate him and then by ignoring the pain, breathing problems, swelling, and eye irritation that they knew had resulted. The shower they let Danley take was less than two minutes in duration, while the jail's own policy allegedly specified that one allowed for this purpose must be fifteen minutes long in order to ameliorate the effects of the spray. Grossly inadequate measures to treat an inmate's serious medical need will not eliminate a jailer's liability for deliberate indifference. See McElligott, 182 F.3d at 1256 ("[P]rison officials with knowledge of [a serious] need for care may not . . . provid[e] grossly inadequate care, caus[ing] a prisoner to needlessly suffer the pain resulting from his or her illness."); Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985) (stating that a jailer may be deliberately indifferent if the treatment provided is "so

25

cursory as to amount to no treatment at all").  The jailers allegedly did nothing when the inadequacy of the decontamination shower became apparent from Danley's and the other inmates' continuing complaints.

Finally, Allyn, Wood, and Woods were more than grossly negligent.  "When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference."  Bozeman, 422 F.3d at 1273 (internal quotation marks and citation omitted).  Danley has alleged that the three jailers did exactly that.

Allyn, Wood, and Woods contend that, even if there were a constitutional violation, they are nonetheless entitled to qualified immunity because "there is no clearly established law that would put [them] on notice that their conduct was unlawful with regard to the . . . medical care claim[]."  We disagree.  A government official can be put on notice that his actions will violate a constitutional or statutory right by one or more of three sources:  (1) a specific constitutional or statutory provision; (2) a legal principle announced by a decision from a court with jurisdiction over the place where the violation of rights was committed; and (3) a case with similar facts that has already been decided by one of those courts.  Goebert, 510 F.3d at 1330.

This is a case in which general legal principles announced by our decisions in this area of law are enough to make the right violated clearly established. As we have concluded, Danley alleged both a serious medical need and the jailers' deliberate indifference to it. The allegations in the complaint are that the jailers took only ineffective measures to remedy the need and then mocked Danley and ignored his pleas for help. Our earlier deliberate indifference decisions have stated that when jailers are aware of serious medical needs they may not ignore them or provide grossly inadequate care. Bozeman, 422 F.3d at 1273; McElligott, 182 F.3d at 1256. Although Danley's allegations may later turn out to be unfounded, reasonable jailers would have been aware that the conduct that Danley alleges violated his clearly established rights. The district court did not err in concluding that Allyn, Wood, and Woods are not entitled to qualified immunity on Danley's deliberate indifference claim.

**IV.**

Jail Administrator Rikard and Sheriff Willis contend that the district court erred by concluding that they were not entitled to qualified immunity on Danley's supervisory liability claim. Danley's complaint does not allege that Rikard and Willis were personally involved in the pepper spraying or the denial of medical care. Instead, it alleges that the two were aware that Allyn, Wood, and Woods had

27

used excessive force and provided inadequate care for pepper spray injuries in the past. That knowledge, Danley argues, put Rikard and Willis on notice that their jailers were using pepper spray inappropriately. Yet neither of the two did anything to correct the problem.

As an initial matter, Danley asks us to reconsider our heightened pleading standard for § 1983 claims in light of the Supreme Court's decisions in <u>Leatherman v. Tarrant County N.I.C.U.</u>, 507 U.S. 163, 113 S. Ct. 1160 (1993) (rejecting a heightened pleading requirement for § 1983 claims alleging municipal liability), <u>Crawford-El v. Britton</u>, 523 U.S. 574, 118 S. Ct. 1584 (1998) (holding that a prisoner bringing a § 1983 action against government official need not present clear and convincing evidence of official's improper motive in order to defeat official's motion for summary judgment), and <u>Swierkiewicz v. Sorema, N.A.</u>, 534 U.S. 506, 122 S. Ct. 992 (2002) (holding that a plaintiff's complaint in a Title VII case need not contain specific facts sufficient to establish a prima facie case under <u>McDonnell Douglas</u>). Danley argues that those two Supreme Court decisions eliminated any heightened pleading requirement for § 1983 cases even when the defense of qualified immunity is raised.

However, the Court did not address in <u>Leatherman</u>, <u>Crawford-El</u>, or <u>Swierkiewicz</u> the pleading standard for § 1983 cases against officials who are able

28

to assert qualified immunity as a defense. We have continued to apply the heightened pleading requirement in this type of case since those three Supreme Court opinions were issued, see, e.g., Dalrymple v. Reno, 334 F.3d 991, 996 (11th Cir. 2003); Cottone v. Jenne, 326 F.3d 1352, 1362 n.7 (11th Cir. 2003). We are bound to apply the heightened pleading requirement even if no one raised Danley's argument in our earlier cases. See Smith v. GTE Corp., 236 F.3d 1292, 1302–03 (11th Cir. 2001) (rejecting an "overlooked reason" exception to the prior panel precedent rule). Under the heightened pleading requirement, the relevant facts must be alleged "with some specificity." Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003) (internal quotation marks and citation omitted). We will dismiss a complaint under the heightened pleading standard where the allegations are "vague and conclusory." Id. (internal quotation marks and citation omitted). These are not.

"Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability." Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994) (internal quotation marks and citation omitted). "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Gonzalez, 325 F.3d at 1234 (internal quotation marks and citation omitted). "Supervisory liability occurs

29

either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).

"The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" Cottone, 326 F.3d at 1360 (citation omitted). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Brown, 906 F.2d at 671. A plaintiff can also establish the necessary causal connection by showing "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," Gonzalez, 325 F.3d at 1235, or that a supervisor's "custom or policy . . . resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991).

In Cottone, the plaintiffs, the estate and the father of a deceased inmate who had been held at the Broward County Jail, alleged that jail supervisors were liable for the jail guards' failure to monitor a mentally disturbed individual who attacked

30

and killed the inmate.  Cottone, 326 F.3d at 1361.  The complaint further alleged that "the defendants were on notice of the widespread unconstitutional conduct" by guards at the jail but had failed to properly train and supervise them.  Id.  This Court held that the plaintiffs failed to state a claim of supervisory liability because the complaint did not allege "any specific facts at all" showing that the supervisors had knowledge of the guards' failure to monitor the inmates during this incident "or even one prior incident."  Id.

Because the complaint in Cottone failed to allege that the supervisors were on notice of the guards' unconstitutional conduct, it did not adequately allege that they were aware of a need to correct it through further training or supervision.  Id. at 1361–62.  Furthermore, the plaintiffs in that case did not allege that a policy or custom implemented by the supervisors was involved with the inmate's death or that the supervisors instructed the guards to commit constitutional violations.  Id. at 1362.  Therefore, "the plaintiffs fail[ed] to establish the necessary causal connection between the supervisors and the unconstitutional conduct in issue for supervisory liability to be imposed."  Id.

Unlike the plaintiffs in Cottone, Danley has alleged sufficiently specific facts to establish the necessary causal connection between supervisors Rikard and Willis and the unconstitutional conduct of the jailers.  Danley's complaint alleges

31

that before this incident, Rikard and Willis had knowledge through "force reports and similar documents, inmate complaints, jailer complaints, attorney complaints, judicial officer complaints, and personal observation" that jailers at the Lauderdale Detention Center "regularly used pepper spray excessively as a means of punishment and not for legitimate reasons." The complaint also alleges that through the same sources, Rikard and Willis were aware that jailers at the detention center "regularly denied inmates prompt and adequate ventilation, decontamination, and medical care following pepper spray discharge as a means of punishment and not for legitimate reasons."

The allegations are that, in spite of "numerous known incidents," Rikard and Willis took no action. They "did not discipline known incidents, and did not conduct additional training despite knowledge that pepper spray was being improperly used on a regular basis by jailers and that inmates were being denied proper treatment after spraying incidents." In addition, Rikard and Willis were aware, before the incident involving Danley, "of numerous such incidents on the shift on which Allyn, Wood, and Woods worked. Nevertheless, the jailers engaging in this pattern of abuse were not disciplined for their actions or provided with additional training."

Taking the allegations as true, which we must do at this stage of the proceedings, the numerous complaints to Rikard and Willis about the excessive use of pepper spray and the denial of adequate medical treatment to inmates, especially during the shift on which Allyn, Wood, and Woods worked, were enough to put them on notice of misconduct that was sufficiently "obvious, flagrant, rampant and of continued duration" to require them to act. See Brown, 906 F.2d at 671. Because they allegedly failed to do so and the misconduct continued, Danley has established the necessary causal connection to hold Rikard and Willis liable in their supervisory capacities. See Cottone, 326 F.3d at 1360.

Rikard and Willis contend that they could not have been on notice of the jailers' misconduct because, according to Danley's complaint, Allyn, Wood, and Woods falsified the incident report for his own case "in order to cover up their allegedly wrongful actions." Even if the three jailers falsified the report for Danley's case, however, that would not absolve Rikard and Willis from responsibility for failing to act in response to the "numerous" prior incidents of similar conduct of which they were specifically aware.

Rikard and Willis also argue that, even if Danley has stated a claim for supervisory liability, they are still entitled to qualified immunity because "Danley cannot point to any clearly established law which demonstrates that the alleged

33

actions of Willis and Rikard violated his constitutional rights." This Court has long recognized that supervisors are liable for the excessive force and the deliberate indifference of their employees where the supervisors received numerous reports of prior misconduct of that nature by those same employees and did nothing to remedy the situation. See, e.g., Gearson v. Kemp, 891 F.2d 829, 839–40 (11th Cir. 1990) (involving a claim of supervisory liability against prison warden for his employees' deliberate indifference to inmate's serious medical need); Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir. 1985) (involving a claim of supervisory liability against city public safety director for his employees' use of excessive force). The district court properly denied Rikard and Willis' motions to dismiss on qualified immunity grounds Danley's supervisory liability claim.

**AFFIRMED.**