[DO NOT PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-10499

Non-Argument Calendar

_____

GERALD J. CARTER,

Plaintiff-Appellant,

*versus*

J. MCCULLEN,
Assistant Warden,
In Individual and Official Capacity,
MICHAEL WALIN,
Lieutenant,
In Individual and Official Capacity,
TIMOTHY MERRITT,
Sergeant,
In Individual and Official Capacity,
P. WILLIAMS,

Sergeant,

In Individual and Official Capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:22-cv-00038-HLA-MCR

_____

Before JORDAN, JILL PRYOR, and LUCK, Circuit Judges.

PER CURIAM:

Gerald Carter appeals the district court's order dismissing his 42 U.S.C. section 1983 complaint without prejudice for failure to state a claim.  Because Carter's complaint and its attachments, liberally construed, did not plausibly allege Eighth or Fourteenth Amendment violations, we affirm.

## FACTUAL BACKGROUND

We present the facts—taken as true from Carter's complaint and its attachments—in the light most favorable to him.  *See Saunders v. Duke*, 766 F.3d 1262, 1266, 1270 (11th Cir. 2014).

In April 2021, Carter was imprisoned at the Florida State Prison in Raiford, Florida.  Around 9:00 p.m. on the evening of

April 20, Carter asked Sergeant Timothy Merritt if he could use the phone. When Sgt. Merritt said no, Carter asked to speak with Sgt. Merritt's supervisor. When Sgt. Merritt again said no, Carter told Sgt. Merritt he was having a psychological emergency and wanted to kill himself; Carter also, "without thinking[,] began slamming [his] locker lid." Sgt. Merritt told Carter to "keep it up" and activated his walkie-talkie so the other prison officials could hear the ruckus. Carter "voluntarily ceased" slamming his locker lid after Sgt. Merritt walked away.

About an hour later, Lieutenant Michael Walin (Sgt. Merritt's supervisor) visited Carter. After Carter repeated that he was experiencing a "psychological emergency" and suicidal thoughts, Lt. Walin told him "the nurse [wa]s not here to address [his] issue." Lt. Walin said Carter was "a behavior problem right now" and ordered that Carter be placed on video monitoring for the rest of Lt. Walin's shift. If Carter exhibited "[two] hours of good behavior," Lt. Walin said, then his "medical issue w[ould] be address[ed]." Lt. Walin also warned that "chemical agents w[ould] be utilized" on Carter should he not maintain good behavior.

Then, around 11:00 p.m., the inmate assigned to the cell directly below Carter began complaining that his Ramadan meal was more than two hours late. When none of the prison officials responded, the inmate began slamming his locker lid to get attention. Others joined him in slamming their locker lids.

In hopes of not being mistaken as a participant in the locker-slamming "disturbance," Carter stood at the door of his cell, his

hands extended out through the bars.  But Lt. Walin "fail[ed] to investigate the accuser allegation of [Carter's] conduct" and "did not ensure [Carter] was in his right state of mindframe or even try to defuse the situation before prior approval of chemical agents." Instead, amid the hubbub, Carter saw Lt. Walin and Sergeant P. Williams "recording from [the] wing['s] quarter deck," then "walk[ing] down [the] wing . . . with the chemical agents at the ready."  The two walked "secretly and quietly" down the cellblock, with Lt. Walin "concealing the chemical agent [Sgt.] P. Williams was carrying."  Carter was "distracted by [his cellblock neighbor's] loud voice" and only noticed Lt. Walin and Sgt. Williams standing by his cell door a moment before Sgt. Williams sprayed the chemical agent.

When the two reached Carter's cell, he started to ask Lt. Walin about his medical issue—at that moment, however, Sgt. Williams "point[ed] the . . . chemical at [Carter's] face and squeeze[d] head level, hitting [Carter] with the chemicals directly in the face on the first and second squeeze."  In total, Sgt. Williams sprayed Carter with three one-second bursts.  With his eyes closed, Carter felt his way first to his jacket—to cover his face—and then to his sink, where he flushed his eyes and mouth with cold water. Carter was then taken for medical care.

Two inmate affidavits were attached to Carter's complaint. Both swore that Sgt. Williams "mistakenly sprayed" Carter.  One attested that, "when the shift officer and [sergeant] heard the noise, they did not investigate the situation, instead they used chemical

agents on the wrong inmate . . . due to a previous unrelated incident." Another averred that Lt. Walin and Sgt. Williams "assumed it was [Carter] who was being disruptive, so they came back" to his cell and sprayed the chemical agent.

Following the pepper spray incident, Assistant Warden J. McCullen falsified the doctor's reports. And Sgt. Merritt "falsifi[ed] documents for the sole purpose to have force use[d] against [Carter] to cause pain and suffering."

Carter filed a grievance with Assistant Warden McCullen, complaining about "[u]nlawful use of chemical agents, falsifying of documents, excessive force[, and] failure to intervene." On May 27, before receiving a response, Carter was transferred to Charlotte Correctional Institution, where he filed another grievance. Carter's grievances resulted in an investigation.

## PROCEDURAL HISTORY

In January 2022, Carter sued Assistant Warden McCullen, Lt. Walin, Sgt. Merritt, and Sgt. Williams under section 1983, alleging that they violated his Eighth and Fourteenth Amendment rights.[1] Construed liberally, Carter raised three possible procedural due process claims: (1) Assistant Warden McCullen's failure to

---

[1] Carter contends on appeal that he also asserted a First Amendment retaliation claim, but we do not find such a claim in his complaint, even liberally construed. At any rate, even if he had pleaded a First Amendment claim, he abandoned it on appeal by making only a passing reference to it. *See Sapuppo v. Allstate Floridian Ins.*, 739 F.3d 678, 681 (11th Cir. 2014).

respond (or ensure a response) to Carter's grievances; (2) Assistant Warden McCullen's transferring Carter to Charlotte Correctional Institution; and (3) Assistant Warden McCullen and Sgt. Merritt's falsification of documents. Carter also raised three possible Eighth Amendment claims: (1) Sgt. Merritt and Lt. Walin's failure to summon medical help for Carter's "psychological emergency"; (2) Sgt. Williams's excessive use of force in spraying Carter in the face with the chemical agent; and (3) Assistant Warden McCullen and Lt. Walin's failure to "safeguard" or "protect" Carter from Sgt. Williams's excessive use of force.

Carter alleged various injuries resulting from his claims, including burning skin, loss of breath, watery eyes, diminished eyesight, black spots in his vision, mental anguish, fear and hatred of government officials, and increased worry about his family. For relief, Carter sought compensatory, punitive, and nominal damages, as well as transfer to a prison nearer his family.

The district court reviewed Carter's complaint sua sponte pursuant to 28 U.S.C. section 1915(e)(2), which requires a district court to dismiss a complaint filed in forma pauperis if, among other things, it "fails to state a claim on which relief may be granted." § 1915(e)(2)(B)(ii). The district court read Carter's complaint as alleging constitutional violations based on (1) mishandled grievances, (2) his transfer to a more distant correctional institution, (3) Lt. Walin's failure to investigate, (4) Sgt. Williams's use of the chemical spray, and (5) Sgt. Merritt's falsification of documents.

As to the first two—which the district court framed as due-process claims—it noted that neither mishandled grievances nor prison transfers violated the Fourteenth Amendment. And as to Lt. Walin's failure to investigate and Sgt. Merritt's falsification of documents, the district court deemed Carter's allegations entirely conclusory. Finally, the district court observed that, "[e]ven if Williams erred in selecting the wrong inmate to spray, accidents, mistakes, and negligence are not constitutional violations"—meaning Williams's conduct didn't "amount to an Eighth Amendment violation." The district court thus dismissed Carter's complaint without prejudice for failure to state plausible claims for relief.

Carter timely appealed the district court's order.

## STANDARD OF REVIEW

We review de novo a district court's sua sponte dismissal for failure to state a claim under section 1915(e)(2). *Hughes v. Lott*, 350 F.3d 1157, 1159–60 (11th Cir. 2003). Because "[t]he language of section 1915(e)(2)(B)(ii) tracks the language of Federal Rule of Civil Procedure 12(b)(6)," we apply rule 12(b)(6) standards to our review. *Mitchell v. Farcass*, 112 F.3d 1483, 1490 (11th Cir. 1997). To survive rule 12(b)(6) scrutiny, a complaint must allege "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## DISCUSSION

Carter argues that the district court "erred in concluding that [his] complaint fail[ed] to state a claim." He asserts that the district court "misapplied the proper legal standards" in evaluating his Eighth and Fourteenth Amendment claims.

"To prevail on a claim under section 1983, a plaintiff must demonstrate both (1) that the defendant deprived him of a right secured under the Constitution or federal law and (2) that such a deprivation occurred under color of state law." *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011) (cleaned up). Carter asserts deprivations of rights secured to him under the Eighth and Fourteenth Amendments to the U.S. Constitution.

*Fourteenth Amendment Claims*

The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause protects against the deprivation of a constitutionally protected liberty interest by state action without constitutionally adequate process. *See Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003) (citation omitted).

As to Carter's claims that Assistant Warden McCullen failed to respond (or ensure a response) to the grievances and had Carter transferred to another prison, we conclude that Carter failed to state a claim because he didn't allege a deprivation of his constitutionally protected liberty interest. In *Bingham v. Thomas*, we held

that "a prison grievance procedure does not provide an inmate with a constitutionally protected [liberty] interest." 654 F.3d at 1177 (collecting cases). And, in *Meachum v. Fano*, the Supreme Court held that "the Due Process Clause [does not] in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system." 427 U.S. 215, 224–25 (1976) ("The Constitution does not . . . guarantee that the convicted prisoner will be placed in any particular prison, if, as is likely, the [s]tate has more than one correctional institution. . . . Confinement in any of the [s]tate's institutions is within the normal limits or range of custody which the conviction has authorized the [s]tate to impose."). Accordingly, the district court did not err in dismissing these two claims.[2]

As to Carter's claims that Assistant Warden McCullen and Sgt. Merritt falsified documents, we conclude it was properly dismissed because Carter failed to allege specific facts supporting his assertions. Although "the pleading standard [Federal Rule of Civil Procedure] 8 announces does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-

---

[2] Carter's complaint also mentioned a June 2020 grievance he filed requesting statements from two inmates corroborating an earlier incident. According to Carter, although he was told that "both inmates refuse[d] to sign," each denied having even been asked for statements. These allegations appear unrelated to the 2021 chemical-spray and prison-transfer incidents. At any rate, like with his 2021 grievances, Carter failed to state a claim as to the June 2020 grievance because he lacked a constitutionally protected interest in the prison's grievance procedures.

unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A complaint that offers only "labels and conclusions"—or that "tenders naked assertions devoid of further factual enhancement"—does not suffice. *Id.* (cleaned up) (quoting *Twombly*, 550 U.S. at 557).

Here, Carter's assertions were limited to the following. He alleged that he filed grievances complaining about the "falsifying of documents." He alleged that Assistant Warden McCullen engaged in "falsification of dr.'s reports." And he alleged that Sgt. Merritt "falsifi[ed] documents for the sole purpose to have force use[d] against [Carter] to cause pain and suffering." Nowhere does he identify specific documents that were falsified. Nor does he explain what made those documents false, or how they caused a violation of his due process rights. In short, Carter tendered only "naked assertions devoid of further factual enhancement."[3] *See Iqbal*, 556 U.S. at 678. This was not enough to state a claim.

---

[3] Carter's appellate brief sheds some light on what he had in mind. There, he says that, "[w]hen three other inmates housed below [Carter] started slamming their locker lids and complaining about denial of the [Ramadan] meal, Sergeant Merritt, set upon causing [Carter] ill will and cruel punishment for his previous action, notified his supervisor Lt. Walin that it was [Carter] being disorderly again. Within minutes," Lt. Walin and Sgt. Williams appeared at Carter's cell and sprayed him. He also says that "[t]wo disciplinary reports were fabricated" following the spraying but "upon further investigation were not processed." But a party cannot amend his complaint by raising new facts in his appellate brief, so we do not consider these assertions in reviewing the district court's dismissal order. *See Adams ex rel. Kasper v. Sch. Bd. of St.*

*Eighth Amendment Claims*

"The Eighth Amendment's prohibition against cruel and unusual punishment, applicable to the State of Florida through the Due Process Clause of the Fourteenth Amendment, prohibits the 'unnecessary and wanton infliction of pain.'" *Thomas v. Bryant*, 614 F.3d 1288, 1303 (11th Cir. 2010) (citations omitted). In the prison context, we recognize Eighth Amendment claims challenging (1) specific conditions of confinement, (2) excessive use of force, and (3) deliberate indifference to a prisoner's serious medical needs. *Id.* at 1303–04 (citation omitted).

As to Carter's claims that Sgt. Merritt and Lt. Walin failed to summon medical help for Carter's psychological emergency, "[a] complete denial of readily available treatment" can constitute deliberate indifference. *See Bingham*, 654 F.3d at 1176 (11th Cir. 2011) (citation omitted). Still, a plaintiff asserting a deliberate difference claim must allege (1) a serious medical need, (2) the defendant's deliberate indifference to that need, and (3) a causal link between the defendant's indifference and his injury. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (citations omitted). Here, Carter's complaint did not plausibly allege the third element. That is, he did not allege any causal connection between his alleged injuries and his lack of medical care before the chemical spraying incident. Carter thus failed to state a claim for deliberate indifference.

---

*Johns Cnty.*, 57 F.4th 791, 799 n.2 (11th Cir. 2022) (en banc) ("Adams cannot amend the complaint by arguments made in an appellate brief.").

Turning to Carter's claim that Sgt. Williams used excessive force by spraying the chemical agent, "it is well-established that the use of chemical agents on recalcitrant prisoners is not per se unconstitutional." *Thomas*, 614 F.3d at 1310 (citation omitted). "Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) (quotation omitted). We thus "give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." *Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019) (citation omitted); *accord Hudson v. McMillian*, 503 U.S. 1, 6 (1992) ("[P]rison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (cleaned up)). Still, "where chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement." *Thomas*, 614 F.3d at 1311 (citation omitted).

Serious injury is not required. *Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010) (citing *Hudson*, 503 U.S. at 4). Instead, "the core judicial inquiry" centers on "the nature of the force" used—that is, "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 34, 37 (citing *Hudson*, 503 U.S. at 7). In analyzing whether "force was applied maliciously and sadistically to cause harm," we

consider "the need for the application of force, the relationship be-tween that need and the amount of force used, the threat reasona-bly perceived by the responsible officials, and any efforts made to temper the severity of a forceful response," as well as the nature and extent of the plaintiff's injuries. *Skrtich v. Thornton*, 280 F.3d 1295, 1300, 1303 (11th Cir. 2002) (quotation omitted); *see also Hud-son*, 503 U.S. at 7.

Applying the *Skrtich* factors here, we conclude that the dis-trict court did not err in dismissing Carter's excessive-force claim for failure to state a claim. First, as to the need for the application of force, Carter alleged that—in the moments leading up to him being sprayed with the chemical agent—numerous inmates were slamming their locker lids in protest of an inmate not receiving his Ramadan meal. In the heat of the disturbance, the allegations show that Sgt. Williams mistakenly assumed Carter was among those slamming locker lids. Sgt. Williams was thus justified in using force—including against Carter—in an effort to restore order at the prison. *See Danley*, 540 F.3d at 1307. This factor weighs against excessive force.

The second and third *Skrtich* factors—"the relationship be-tween th[e] need [for force] and the amount of force used," and "the threat reasonably perceived by the responsible officials"—do too. We held in *Danley* that a three- to five-second burst of pepper spray "[wa]s not disproportionate to the need to control an inmate who ha[d] failed to obey a jailer's orders" to return to his cell and stop complaining about a dirty bathroom and lack of toilet paper.

540 F.3d at 1304, 1307.  Rather, we said the short burst of pepper spray was "a reasonable response to th[e] threat" of an inmate "creat[ing] a disturbance by failing to obey orders."  *Id.* at 1308.  Like the verbally disruptive inmate in *Danley*, here Sgt. Williams (mistakenly) believed Carter was making disruptive noise in disobedience to Lt. Walin's earlier order that Carter behave or be subject to chemical spray.  Applying *Danley*, we thus conclude that Sgt. Williams's three one-second bursts of chemical-agent spray were not "disproportionate to [either] the need to control" Carter or the threat Sgt. Williams reasonably perceived.

Moreover, the fourth *Skrtich* factor—"any efforts made to temper the severity of a forceful response"—also weighs against excessive force.  Carter alleged that he was immediately permitted to cover his face with his jacket, then wash his face and mouth in his sink.  He also alleged that Lt. Walin and Sgt. Williams took him to receive medical care.  The prison officials allowing Carter to avoid additional exposure to the chemical agent, allowing him to rinse his face and mouth, and taking him for medical assistance all represent "efforts made to temper the severity" of the chemical spray.

Finally, the last *Skrtich* factor—the nature and extent of Carter's injuries—likewise weighs against excessive force.  Carter alleged burning skin, loss of breath, watery eyes, diminished eyesight, and black spots in his vision.  But "[p]epper spray 'is designed to disable a suspect without causing permanent physical injury,'" *Danley*, 540 F.3d at 1308, and Carter pleaded no facts from which

we can infer that his injuries have persisted since he received medical care.

In sum, Sgt. Williams used only three one-second bursts of spray, a proportionate response to a perceived noise disturbance being created (in part) by Carter in contravention of Lt. Walin's earlier good-behavior order. Carter did not allege long-lasting injuries, and his immediate pain and suffering were tempered both by his ability to cover and wash his face and by the medical care he received. For these reasons, we conclude that Carter did not plausibly allege an Eighth Amendment excessive use of force violation. *Cf. id.* at 1307 ("If there were nothing before us but the initial [three- to five-second] use of pepper spray following Danley's second failure to obey Allyn's order to return to the cell, we would readily conclude that there was no Fourteenth Amendment violation."). The district court therefore did not err in dismissing Carter's claim against Sgt. Williams.

Finally, because we conclude that Sgt. Williams did not violate Carter's Eighth Amendment rights, we also conclude that neither Lt. Walin's nor Assistant Warden McCullen's failures to intervene or protect Carter from being sprayed constituted constitutional violations. *Cf. Skrtich*, 280 F.3d at 1301 ("[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of *another officer's use of excessive force* can be held personally liable for his nonfeasance." (emphasis added) (citation omitted)).

**AFFIRMED.**

JORDAN, Circuit Judge, concurring.

I join the court's opinion except as to the resolution of the Eighth Amendment excessive force claims. As to those claims, I would affirm the dismissal on a different ground and concur in the judgment.

The complaint and attached affidavits alleged that Sgt. Williams "mistakenly" sprayed Mr. Carter. Sgt. Williams, it is claimed, incorrectly assumed that Mr. Carter was being disruptive by slamming his locker. It seems to me that the Eighth Amendment excessive force claims fail under Supreme Court precedent because Mr. Carter has not alleged that Sgt. Williams' use of the chemical agent was malicious or sadistic. *See Hudson v. McMillan*, 503 U.S. 1, 607 (1992) ("[W]henever prison officials stand accused of using excessive force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."). *Cf. Lumley v. City of Dade City*, 327 F.3d 1186, 1198 (11th Cir. 2003) (arrestee did not state substantive due process claims against officers who strapped him to his hospital bed because he only alleged negligence).