[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-12553

_____

D.C. Docket No. 07-00052 CV-HLM-4

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 27, 2009
THOMAS K. KAHN
CLERK

REGINALD SCOTT FENNELL,

Plaintiff-Appellant,

versus

JAMES GILSTRAP,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(February 27, 2009)

Before WILSON and COX, Circuit Judges, and FAWSETT,[*] District Judge.

PER CURIAM:

---

[*]Honorable Patricia C. Fawsett, United States District Judge for the Middle District of Florida, sitting by designation.

We decide in this appeal whether an officer, James Gilstrap, used excessive force in violation of the Fourteenth Amendment when he kicked a pretrial detainee, Reginald Scott Fennell, who was combative and struggling with police officers. Gilstrap witnessed an earlier struggle between Fennell and officers, heard Fennell threaten officers, heard a fellow officer call out for Fennell to let go of his arm while struggling with Fennell, and witnessed six officers struggle unsuccessfully to handcuff Fennell for fifteen seconds. Gilstrap attempted to kick Fennell in the arm, but his kick landed on Fennell's face. We conclude that Fennell has not shown that Gilstrap's kick was a malicious and sadistic use of force in violation of the Fourteenth Amendment. Accordingly, Gilstrap is entitled to qualified immunity for Fennell's 42 U.S.C. § 1983 claim against him alleging excessive force in violation of the Fourteenth Amendment.

## I. BACKGROUND

On January 28, 2007, Sheriff's Deputy Kevin Hubbard arrested Reginald Fennell on several misdemeanor charges.[1] While in Hubbard's car, Fennell began kicking the windows and doors, and so Hubbard placed leg restraints (a hobble) on him. (R.1-30, Statement of Kevin Hubbard at 3-4.) Deputy James Gilstrap heard on

[1]Fennell does not remember what happened during his arrest or while at the police station on January 28, 2007. (R.1-21 at 26-27.) Accordingly, the evidence about what occurred comes entirely from the statements of police officers and a surveillance video of the pat-down room.

2

the police radio that Hubbard was bringing someone to the jail who was combative. (R.1-23 at 28.) When Hubbard and Fennell arrived at the jail, Hubbard and other officers brought Fennell into the pat-down room.[2] (R.1-23 at 18.) The officers placed Fennell on the floor because he was being combative and uncooperative during the pat down. (R.1-30, Statement of Kevin Hubbard at 5.) Gilstrap, having heard a commotion in the pat-down room, entered the room. (R.1-23 at 18.) While on the floor, Fennell verbally abused the officers, and threatened to come after Deputy Hubbard at his home. (R.1-30, Statement of Diane Carter at 3; Statement of Kevin Hubbard at 4.) Hubbard and the other officers removed Fennell's boots and leg restraints, brought Fennell to his feet and placed him against a wall. (R.1-30, Statement of Kevin Hubbard at 5.) Hubbard then removed Fennell's handcuffs. (*Id.*) At this time, Fennell was calm. (R.1-30, Statement of Jeremy Woody at 3.) Gilstrap then left the room; seven officers remained in the room with Fennell. (R.1-30, Statement of James Gilstrap at 3; Statement of Christina Bell at 3.)

One of the officers asked Fennell to remove his hooded sweatshirt. (R.1-30, Statement of Christina Bell at 1.) As he was removing his sweatshirt, Fennell "kept turning around looking at [the officers] in a very aggressive manner." (*Id.*) "[H]e

---

[2]The surveillance video does not contradict the officers' statements about what happened in the pat-down room.

3

was trying to make eye contact with people like, picking out who it was he was gonna take out . . . ." (R.1-30, Statement of Dawn Walker at 4.)  One of the officers told Fennell to turn around and face the wall, and he did so.  Fennell then took his hands off the wall and turned around again.  (R.1-30, Statement of Walter Huskey at 2.)  Deputy Walter Huskey then physically turned Fennell back around towards the wall, and Fennell's head bumped the wall.  (*Id*.)  Fennell yelled, turned around, grabbed Huskey with his left arm and starting moving his right arm with a closed first towards Huskey.  (*Id*.)  The officers in the room then wrestled Fennell to the ground, where a struggle ensued.  (R.1-30, Statement of Kevin Hubbard at 5; Statement of Walter Huskey at 2-3.)

Fennell grabbed Huskey's arm and twisted it; Huskey shouted, "Let go of my arm, let go of my arm."  (R.1-30, Statement of Walter Huskey at 3.)  Gilstrap heard Huskey's cries and entered the pat-down room.  (R.1-23 at 22.)  When Gilstrap entered the room, he saw Fennell struggling with officers.  (*Id*.)  Some officers were trying to contain Fennell's feet.  (R.1-30, Statement of Kevin Hubbard at 5.)  Others were hitting Fennell in an attempt to get him to let go of Officer Huskey's arm.  (R.1-30, Statement of Daniel Jared Weathers, at 4.)  Gilstrap walked around Fennell in an

4

effort to "try and break his hold loose by kicking him in the arm."[3]  (R.1-23 at 23.)

Gilstrap then prepared to kick Fennell by moving an officer out of the way and telling

him to move his (the officer's) head.  (*Id*. at 33; R.1-30, Statement of Daniel Jared

Weathers at 5).  Gilstrap, wearing military-style boots, kicked Fennell in the face.

(R.1-23 at 23.)

After the kick, the officers were able to roll Fennell over and handcuff him.

(R.1-30, Statement of Daniel Jared Weathers at 5; *see also* R.1-30, Statement of

Walter Huskey at 3.)  A pool of blood was on the ground, and Fennell had a left

orbital fracture, a septal fracture, and a nasal fracture.  (R.1-30, Cartersville Medical

Records at 4; R.1-23 at 25.)

Following an internal investigation, the Bartow County Sheriff's Office fired

Gilstrap for using excessive and unnecessary force when he kicked Fennell.  (R.1-24

at 12.)

Fennell then filed this lawsuit against Gilstrap in his individual capacity,

seeking relief under 42 U.S.C. § 1983 and Georgia law.  Fennell alleged that Gilstrap

violated his right to be free from injuries caused by excessive force.  (R.1-1 at 4.)

---

[3]Fennell argues repeatedly that the video shows Gilstrap walking around a prone and subdued Fennell to carefully kick a man in the head who had stopped resisting.  Gilstrap testified, however, that he walked around Fennell, who was entangled with six police officers, to try to kick him in the arm; the video does not contradict that.  While we view the evidence in the light most favorable to Fennell, we cannot ignore uncontradicted evidence simply because it is unfavorable to Fennell.

Gilstrap moved for summary judgment. The district court understood Fennell's § 1983 claim to assert a Fourteenth Amendment[4] violation, as the alleged excessive force occurred while he was a pretrial detainee. The court first determined that a genuine dispute existed as to whether Fennell had established a constitutional violation. (R.1-34 at 24-25.) The court then examined whether Gilstrap's actions violated clearly established law. (*Id*. at 33.) The court concluded that it was not clearly established that Gilstrap's actions violated Fennell's constitutional rights, and so granted summary judgment to Gilstrap on the § 1983 claim. (*Id*. at 34-35.) The court then declined to exercise supplemental jurisdiction over Fennell's state law claim, and dismissed it without prejudice. (*Id*. at 37.) Fennell appeals the order granting summary judgment and dismissing his state law claim.

## II. ISSUES ON APPEAL AND CONTENTIONS OF THE PARTIES

We examine in this appeal whether Gilstrap is entitled to qualified immunity for this alleged Fourteenth Amendment violation, and whether the district court erred in dismissing Fennell's state law claim.

---

[4]The district court also stated in a footnote that its conclusion would have been the same if Gilstrap's kick had violated Fennell's Fourth Amendment rights, and not Fourteenth. Although Fennell argues in his initial brief that he has shown a Fourth Amendment violation, he correctly states in his Reply Brief that his claim is governed by the Fourteenth Amendment. (Appellant's Reply Br. at 6-7.) *See Garrett v. Athens-Clarke County, Ga.*, 378 F.3d 1274, 1279 n.11 (11th Cir. 2004) (If excessive force claim arises out of events occurring during an arrest, the Fourth Amendment governs. If claim arises out of events occurring while plaintiff is a pretrial detainee, the Fourteenth Amendment governs.).

Fennell argues that, under this circuit's precedent, qualified immunity is not available once a plaintiff has shown excessive force in violation of the Fourteenth Amendment. Accordingly, Fennell contends the district court erred in granting summary judgment on his § 1983 claim and dismissing his state law claim.

Gilstrap responds that he is entitled to qualified immunity because Fennell has failed to show evidence that Gilstrap violated Fennell's Fourteenth Amendment rights, and because, even if a violation did occur, it was not in violation of clearly established law.

### III. STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. *Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002) (citation omitted). Summary judgment is appropriately granted if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007) (citation omitted). We view the evidence in the light most favorable to the non-moving party. *Id.*

### IV. DISCUSSION

First, we address whether qualified immunity is available once a plaintiff has shown excessive force in violation of the Fourteenth Amendment. Fennell relies on *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005), for the proposition that

qualified immunity is not available once a plaintiff has shown excessive force in violation of the Fourteenth Amendment.[5] Fennell argues that, because the district court concluded that he had put forward evidence sufficient to show excessive force in violation of the Fourteenth Amendment, the district court erred in holding that Gilstrap was entitled to qualified immunity.

The qualified immunity inquiry usually involves two prongs. First, a plaintiff must show that a constitutional or statutory right has been violated. Second, a plaintiff must show that the right violated was clearly established.[6] *Danley v. Allen*, 540 F.3d 1298, 1306 (11th Cir. 2008) (citations omitted). For claims of excessive force in violation of the Eighth or Fourteenth Amendments, however, a plaintiff can overcome a defense of qualified immunity by showing only the first prong, that his Eighth or Fourteenth Amendment rights have been violated. *Johnson v. Breeden*, 280 F.3d 1308, 1321-22 (11th Cir. 2002). We created this rule because, for an excessive-

---

[5]A claim of excessive force under the Fourteenth Amendment is analyzed as if it were an excessive-force claim under the Eighth Amendment. *Bozeman*, 422 F.3d at 1271. Thus, we look to decisional law of excessive-force claims under both the Fourteenth and Eighth Amendments. *Danley v. Allen*, 540 F.3d 1298, 1306 (11th Cir. 2008).

[6]Although the Supreme Court recently held that lower courts are no longer required to address these prongs in order, it recognized that it is "often beneficial" to do so. *Pearson v. Callahan*, 555 U.S. ___, ___, 129 S. Ct. 808, 818, No. 07-751 (Jan. 21, 2009). *See also Case v. Eslinger*, ___ F.3d ___, 2009 WL 196842, at **4-5 (11th Cir. Jan. 29, 2009) (discussing *Pearson*). *Pearson*, however, has no application in a Fourteenth Amendment excessive-force claim because the qualified immunity analysis involves only the first prong.

force violation of the Eighth or Fourteenth Amendments, "the subjective element required to establish it is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution . . . ." *Id. See also Danley*, 540 F.3d at 1310 (conducting qualified immunity analysis for alleged Fourteenth Amendment violation by examining solely the first prong).

We agree with Fennell, therefore, that the district court erred in granting summary judgment on the ground that Gilstrap's use of excessive force was not a violation of clearly established law after holding that there was evidence of a violation of the Fourteenth Amendment through the use of excessive force. Fennell is correct that he needed only to show that there was evidence to support a finding that Gilstrap had violated the Fourteenth Amendment to defeat Gilstrap's claim of qualified immunity, and the district court concluded that Fennell had, in fact, made such a showing.

Nonetheless, the district court's grant of summary judgment is due to be affirmed because, as Gilstrap argues, Fennell has failed to show that Gilstrap's use of force constituted excessive force violating the Fourteenth Amendment.

A jailor's use of force against a pretrial detainee is excessive under the Fourteenth Amendment if it "shocks the conscience." *Danley*, 540 F.3d at 1307

(internal quotation marks and citation omitted). The use of force does not "shock the conscience" if it is applied "in a good-faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 7, 112 S. Ct. 995, 999 (1992). However, if the force is applied "maliciously and sadistically to cause harm," then it does "shock the conscience," and is excessive under the Eighth or Fourteenth Amendments. *Id.*; *see Danley*, 540 F.3d at 1306 (Eighth Amendment decisional law applicable to Fourteenth Amendment claims).

The standard for showing excessive force in violation of the Fourteenth Amendment, therefore, is higher than that required to show excessive force in violation of the Fourth Amendment. And, indeed, it is higher than that required to show excessive force in violation of Bartow County Sheriff's Office's policies. Here, the Bartow County Sheriff's Office, after an internal investigation, concluded that Gilstrap's use of force was both excessive and unnecessary. That conclusion, even if correct, does not answer the question of whether Gilstrap maliciously and sadistically used force to cause Fennell harm, and thus violated Fennell's Fourteenth Amendment rights.

We consider the following factors in determining whether the force was applied maliciously and sadistically to cause harm, and thus violated the Fourteenth Amendment: a) the need for the application of force; b) the relationship between the

need and the amount of force that was used; c) the extent of the injury inflicted upon the prisoner; d) the extent of the threat to the safety of staff and inmates; and e) any efforts made to temper the severity of a forceful response. *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (citations omitted). When considering these factors, we "give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." *Id.* (internal quotation marks, alterations, and citation omitted). We examine the facts as reasonably perceived by Gilstrap on the basis of the facts known to him at the time. *See Whitley v. Albers*, 475 U.S. 312, 321, 106 S. Ct. 1078, 1085 (1986).

A. The need for the application of force

Fennell argues that there was no need for force, because Officer Huskey was never in danger, and, at the time of the kick, Huskey's arms were clearly free.[7] The undisputed testimony, which is not contradicted by the videotape, is that Gilstrap knew a combative detainee was brought into the station who had to be subdued while he verbally threatened officers. Gilstrap left the room, but returned when he heard

---

[7]Major Gary Dover's after-the-fact assessment that Huskey was "never in great peril," (R.1-24 at 36), is irrelevant to the question of whether force was needed. We examine the facts as they appeared to Gilstrap at the time he used force, not the facts as they appeared to a commanding officer at the conclusion of an exhaustive investigation. Dover admitted that he was judging the situation with the "benefit of hindsight." (*Id*. at 34.)

a fellow officer yell for someone to let go of his arm. Upon entering the room, Gilstrap saw Fennell struggling with six officers, who were unable to restrain or control him, and were unable to handcuff him during the entire 15 seconds Gilstrap was, on this occasion, in the room.

In *Cockrell*, we held that an officer's use of force to quiet an inmate who was shouting was reasonable under the circumstances. 510 F.3d at 1311. We reasoned that, "guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." *Id.* (internal quotation marks omitted). In this case, where an officer was crying out for a detainee to let go of his arm, and where as many as six officers were unable to secure and handcuff Fennell because he was struggling, the need for force was arguably greater than was the case in *Cockrell*. Thus, we cannot say that it was unreasonable for Gilstrap to believe that some force was necessary under the facts presented here.

B. The relationship between the need and the amount of force used

Fennell argues that there was no need to use the amount of force used because the officers were getting Fennell under control, and no one requested Gilstrap's assistance. Fennell's argument is bottomed on his assertion that he was *no longer* threatening to come after officers at their homes, or disobeying orders to stay on the wall, or staring down officers while disobeying commands, or fighting six officers in

12

the pat-down room, or grabbing and twisting an officer's arm, and therefore, Gilstrap's kick was an inappropriate amount of force.

There are two problems with Fennell's argument. First, our precedent permits the use of force even when a detainee is not physically resisting. We have held that when a prisoner created a disturbance by failing to follow a prison guard's instructions and shouting obscenities, it was not unreasonable for the guard to grab the prisoner by the throat and shove him against the prison bars. *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990). Indeed, we previously held that the use of force sufficient to break bones did not violate the Eighth Amendment under the circumstances even though the prisoner had not offered any physical resistance. *Cockrell*, 510 F.3d at 1311.

Second, the evidence is clear that Fennell was not yet secured during his fight with six officers. *Cf. Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (the use of force after a detainee is handcuffed and no longer resisting constitutes excessive force). The undisputed evidence is that Fennell had grabbed Huskey's arm, and Fennell did not let go of Huskey's arm despite being punched by other officers. Gilstrap was in the room for 15 seconds, during which time six officers were unable to secure and handcuff Fennell. Gilstrap's decision to kick Fennell in the arm was not a malicious and sadistic escalation of force, even if the kick accidentally landed on

13

Fennell's face. Accordingly, the relationship between the need for force created by Fennell's conduct and the force Gilstrap decided to use favors a conclusion that the force in this case was not malicious and sadistic, but rather "a good faith effort to maintain or restore discipline in a difficult situation." *Cockrell*, 510 F.3d at 1312 (citation omitted).

C. The extent of the injury inflicted upon the prisoner

Here, Fennell's injuries were substantial. In addition to bruising and cuts, he suffered a left orbital fracture, a septal fracture, and a nasal fracture. His injuries later required him to undergo surgery.

As extensive as Fennell's injuries are, we have held that this may be outweighed by the officer's inability to reasonably anticipate the severity of the injury. *Cockrell*, 510 F.3d at 1311-12. In *Cockrell*, an officer shoved a drunken inmate to the floor, who broke his hip, wrist, and cut his ear. *Id*. at 1310. We held that the officer could not have foreseen that a simple push would result in such extensive injuries, and thus it was less likely that the force was used maliciously and sadistically. *Id.* at 1311-12. In this case, Gilstrap's single kick caused injuries similar to those present in *Cockrell*. Gilstrap, however, did not foresee that his kick would land on Fennell's face. (R.1-23 at 36.) The undisputed evidence was that Gilstrap intended to kick Fennell in the arm, and not the face. (*Id*. at 32, 37.) No

14

evidence in the record supports a contrary inference. Furthermore, Gilstrap kicked Fennell only once, and did not kick him again after the first kick landed on Fennell's face. (*Id*. at 36.) Indeed, the undisputed evidence, as Gilstrap testified, is that, "The fact that he got kicked in the face was an accident."[8] (*Id*. at 37.)

D. The extent of the threat to the safety of staff and inmates

Fennell had been hobbled because he tried to kick out the windows of the deputy's cruiser. He was combative during the initial pat down. He threatened officers verbally. He stared officers down before grabbing one with his hand. He struggled with six officers on the ground, and those six officers were unable to handcuff him, even after 15 seconds of attempting to subdue him. During that struggle, Fennell grabbed one officer's arm such that the officer yelled, more than once, for him to let go of his arm. Therefore, it was not unreasonable for Gilstrap to believe that Fennell posed a substantial threat to the safety of the officers around him.

E. Any efforts made to temper the severity of a forceful response

Fennell argues that this factor favors concluding that Gilstrap's use of force was malicious and sadistic because Gilstrap did not consider doing anything other than kicking Fennell, and thus no effort was made to temper the severity of the

---

[8]Fennell would have us infer from the videotape that Gilstrap carefully planned and executed a kick to Fennell's face. Having viewed the tape in the light most favorable to Fennell, we cannot see how it contradicts Gilstrap's testimony that he was trying to kick Fennell in the arm.

forceful response. Fennell misunderstands the thrust of this factor, and he attempts to reargue that Gilstrap's use of force was disproportionate to the amount of force needed. This factor allows the court to take into account efforts by the police to mitigate the effects of the force that was applied. For instance, in *Cockrell*, the fact that the officers immediately summoned medical assistance for the injured inmate was strong evidence that there was no malicious and sadistic purpose in the use of force. 510 F.3d at 1312. Conversely, we held that a prison guard fails to temper the severity of his use of force when he does not allow a prisoner whom he has pepper sprayed to adequately decontaminate himself. *Danley*, 540 F.3d at 1310. Here, a nurse came immediately after the incident and offered to treat Fennell; Fennell refused the offer. (R.1-30, Statement of Kevin Hubbard at 5.) Fennell was then taken to the shower to wash off the blood. (*Id*. at 6; R.1-30, Statement of Walter Huskey at 3.) The immediate offer of medical assistance shows an effort to temper the severity of the use of force.

In this case, considering all the factors, the undisputed evidence does not show that Gilstrap kicked Fennell maliciously and sadistically. Fennell insists that the kick was unnecessary, that Huskey was never in danger, and that Fennell had stopped struggling. But, Fennell did not testify to this effect, and the statement of every officer in the room during the struggle suggests otherwise. (R.1-30, Statement of

16

Cristina Marie Bell at 1-2; Statement of Kevin Hubbard at 5; Statement of Walter Huskey at 3; Statement of Dawn Walker at 5-6; Statement of Daniel Jared Weathers at 5; Statement of Jeremy Woody at 5; R.1-19, Ex. D at 4.) Having viewed the videotape, we cannot say that it contradicts the officers' accounts of the struggle.

In the absence of evidence that Gilstrap acted maliciously and sadistically, his use of force does not shock the conscience, and thus did not violate the Fourteenth Amendment. Fennell has therefore failed to show any constitutional violation. Gilstrap is entitled to qualified immunity, and summary judgment in his favor was appropriate.

Because summary judgment on Fennell's § 1983 claim was appropriate, we find no error in the district court's dismissal without prejudice of his state law claim.

## V. CONCLUSION

We affirm the district court's order granting summary judgment to Gilstrap, and dismissing the state law claim.

AFFIRMED.

17