[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12429

_____

D.C. Docket No. 5:13-cv-00390-CAR

DAVID A. DANIEL,

Plaintiff-Appellant,

versus

HANCOCK COUNTY SCHOOL DISTRICT,
RICHARD MAYWEATHER,
TAMPA LEWIS,
PATRICK L. WILLIAMS,
KENDREZ MAYWEATHER,

Defendant-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(September 11, 2015)

Before ED CARNES, Chief Judge, ROSENBAUM, Circuit Judge, and SMITH,[*] District Judge.

PER CURIAM:

In this case, members and coaches of two high-school football teams and sheriff's officers tasked with keeping the peace during a high-school football game were embroiled in an altercation that left Plaintiff-Appellant David Daniel seriously injured. Daniel contends that his injuries resulted from Appellees Hancock County School District and Hancock County off-duty sheriff's deputies Richard Mayweather, Tampa Lewis, and Patrick L. Williams's violation of his Fourteenth Amendment substantive-due-process right to bodily integrity. Although the injuries Daniel described were serious, they do not implicate the constitutional protections of the Fourteenth Amendment. After careful review, and with the benefit of oral argument, we therefore affirm the district court's dismissal of David Daniel's complaint.

**I.**

David Daniel ("Daniel") was employed by the Warren County School District as a teacher and the head football coach at Warren County High School

---

[*] The Honorable C. Lynwood Smith, Jr., United States District Court Judge for the Northern District of Alabama, sitting by designation.

2

("Warren").[1]    Warren's football team was scheduled to play against Hancock Central High School ("Hancock") on October 14, 2011, for Hancock's homecoming game.  Hancock was a member school of the Hancock County School District ("District").

In the time leading up to the game, several incidents occurred, elevating the risk of violence at the game.  First, Daniel had replaced the former Warren football coach, who was subsequently hired as an assistant coach for Hancock's football team.  Hancock's coaching staff and team saw the game as an opportunity to "get even" for what they believed had been the wrongful termination of their new colleague from the Warren football team.

Second, on October 7, 2011, one week before the game, members of the Warren football team attended a football game between Hancock and another high school.  After that game, members of the Warren and Hancock football teams were involved in a verbal altercation that required law-enforcement intervention and culminated in the handcuffing of at least one player.

Third, in the week leading up to the game between Warren and Hancock, students and athletes from the two schools exchanged text messages and other communications taunting and threatening each other and warning of possible

---

[1] Since we consider whether the district court properly granted Defendants' motion to dismiss and denied Daniel's motion to amend, we take the information in this section from Daniel's proposed amended complaint and present it in the light most favorable to Daniel.

conflict at the game. Finally, Warren directly notified the District that it had concerns about the security that would be provided at the game, and a Warren County law-enforcement officer inquired into the security measures that would be employed. The District advised the Warren County law-enforcement officer that twelve officers from the Hancock Sheriff's Department and the Sparta Police Department (the local city police department) would be at the game.

On October 14, 2011, Warren and Hancock played the football game. Despite the District's statement that twelve officers would be present, only four off-duty sheriff's officers—Officers Richard Mayweather, Tampa Lewis, and Patrick L. Williams (collectively, "Officers"), who were all residents of Hancock County at the time—performed security at the game. Warren won the game by a score of 21-2, and at least one player was ejected for fighting during the game.

After the game, the Hancock players and coaches remained on the field while the Warren players and coaches exited. Before walking off the field with the Warren players, Daniel angered the Hancock players and coaches by approaching them to congratulate them on their well-played game.

While the Warren players walked to the locker room, at least two Hancock players, including Kendrez Mayweather ("Student Assailant"),[2] followed and taunted them. One of the Warren players responded to the Hancock players'

---

[2] Kendrez Mayweather, the Student Assailant, is unrelated to Defendant-Appellee Officer Richard Mayweather.

taunts, and the Student Assailant and other Hancock players rushed towards the Warren players.  A fight ensued between the two football teams.

The Officers, who had been walking with the Hancock players as they left the field, ran in front of the Hancock players as the two teams advanced towards each other.  When the two teams reached each other, the Officers sprayed the Warren players with pepper spray.  In Daniel's view, the Officers did not spray the Warren players for any legitimate law-enforcement purpose but intended to injure and disable the Warren players in order to assist the Hancock players in the altercation.

During the altercation, the Student Assailant intentionally struck a Warren player who had fallen to the ground after being peppered sprayed by the Officers. When the Warren player attempted to get up, the Student Assailant readied himself to strike the Warren player again.  Daniel then positioned himself in front of the Student Assailant and yelled, "What are you doing?"  In response, the Student Assailant intentionally struck Daniel in the face and head with a helmet.  Daniel sustained serious and permanent injuries as a result.

The District took no action against the Officers or Student Assailant for their roles in the altercation and publicly expressed approval of the Officers' and Student Assailant's actions.  The District also filed false charges against Daniel in relation to the altercation and sought to have the Georgia Professional Standards

5

Commission revoke or suspend Daniel's certification as an educator. The Georgia High School Association, of which both Hancock and Warren are members, investigated the incident and imposed penalties against Hancock. Hancock appealed the imposition of penalties and lost.

## II.

On October 13, 2013, Daniel filed a complaint in the Middle District of Georgia that alleged federal and state claims. In particular, Daniel asserted claims under § 1983 against the District and the Officers (collectively, "Appellees") for violating Daniel's Fourteenth Amendment right to bodily integrity and state tort claims against the Officers and the Student Assailant.[3] The District and the Officers (collectively), respectively, each filed a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P. Daniel timely responded in opposition and also filed a motion for leave to file an amended complaint, attaching a proposed amended complaint.

Basing its review on Daniel's proposed amended complaint, the district court granted Appellees' motions to dismiss Daniel's federal claims without prejudice. The court also concluded that further amendments of the complaint would be futile, so it denied Daniel's motion to amend his complaint. Having dismissed Daniel's federal claims, the district court declined to exercise

---

[3] The Student Assailant did not answer the complaint and is in default.

6

supplemental jurisdiction over Daniel's state-law claims and dismissed his state-law claims without prejudice.

For the reasons set forth below, we now affirm.

## III.

We review *de novo* a district court's dismissal of a complaint for failure to state a claim upon which relief may be granted. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012). Similarly, in instances "when the district court denies the plaintiff leave to amend due to futility, we review the denial *de novo* because it is concluding that as a matter of law an amended complaint 'would necessarily fail.'" *Freeman v. First Union Nat.*, 329 F.3d 1231, 1234 (11th Cir. 2003) (quoting *St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815, 822 (11th Cir. 1999)).

As for the district court's decision not to exercise supplemental jurisdiction, we review that for abuse of discretion. *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 738 (11th Cir. 2006).

## IV.

The "first step [in evaluating a § 1983 claim] should [be] to identify the precise constitutional violation charged . . . and to explain what the violation requires." *Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013). Daniel's proposed amended complaint (the "Complaint") alleges that Appellees violated his

7

Fourteenth Amendment substantive-due-process right to bodily integrity by failing to protect him.[4]  He premises his claim on the Officers' use of pepper spray against the Warren players during the altercation and on the District's failure to provide proper security at the game and failure to properly train and supervise the Officers.

In this section, we address Daniel's claim as it relates to the Officers. Where, as here, a plaintiff claims a violation of substantive due process, "[a]s a general rule, to prevail . . . a plaintiff must prove that a defendant's conduct 'shocks the conscience.'" *Nix v. Franklin Cty. Sch. Dist.*, 311 F.3d 1373, 1375 (11th Cir. 2002) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47, 118 S. Ct. 1708, 1717 (1998)).  In non-custodial circumstances like those at issue in this case, this standard is exceedingly high:  "only a purpose to cause harm unrelated to the legitimate object of [law enforcement] . . . satisf[ies] the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Cty. of Sacramento*, 523 U.S. at 836, 118 S. Ct. at 1711-12.  When considering abusive executive action, the Supreme Court has stressed time and again that "only the most egregious official conduct" qualifies as "'arbitrary in the constitutional sense[.]'" *Id.* at 846, 118 S. Ct. at 1716 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129, 112 S. Ct. 1061, 1071 (1992)).  Force is conscience-

---

[4] Although the district court denied Daniel's motion to amend, in ruling on the motion to dismiss the court considered the proffered amendment as though it had been allowed.  For this reason and because Daniel conceded in his motion to amend that the original complaint was deficient, we base our review on Daniel's proposed amended complaint.

shocking under the Fourteenth Amendment only where it is used "maliciously and sadistically to cause harm." *Fennell v. Gilstrap*, 559 F.3d 1212, 1217 (11th Cir. 2009). "[T]his standard 'is to be narrowly interpreted and applied,' such that 'even intentional wrongs seldom violate the Due Process Clause.'" *Doe v. Braddy*, 673 F.3d 1313, 1318 (11th Cir. 2012) (quoting *White v. Lemacks*, 183 F.3d 1253, 1259 (11th Cir. 1999), and *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003)).

Daniel's Complaint stated that the Officers "purposefully and intentionally pepper sprayed the Warren County players for purposes of injuring the Warren County players, disabling them, and assisting the Hancock Central players in their fight with the Warren County players." It then conclusorily asserted that the Officers' conduct was the "direct and proximate" cause of Daniel's constitutional deprivation.

These allegations suffer from two major problems. First, the Complaint did not allege that the Officers intended to harm Daniel in particular. And second, even if it were amended to do so, as terrible as the allegations are, they would not satisfy the standard in this Circuit of governmental conduct that "shocks the conscience." We address each deficiency in turn.

With regard to the missing allegation that the Officers intended to harm Daniel specifically, Daniel implicitly acknowledges this shortcoming by arguing in

9

his brief on appeal that we should view the Officers' use of pepper spray against the Warren players in such a way as to create the inference that the Officers intended to injure Warren's coaching staff, in order to connect the Officers' conduct to the deprivation. We cannot do this for two reasons.

First, Daniel did not raise this argument in the district court, so he cannot rely on it now for the first time. "Arguments raised for the first time on appeal are not properly before this Court." *Hurley v. Moore*, 233 F.3d 1295, 1297 (11th Cir. 2000).

Second, even if Daniel had made this argument below, it would not have solved the problem because what Daniel suggests is not a logical inference; it is a leap over a canyon. The Complaint specifically alleged that the Officers "intentionally pepper sprayed the Warren County players . . . for the purposes of injuring the Warren County players." It continued, asserting that "[t]he purposeful and intentional conduct [of] [Student Assailant] Kendrez Mayweather was the direct and proximate cause of the serious personal injuries [] Daniel sustained on October 14, 2011." So from the allegation that the Officers pepper sprayed Warren's players—not Daniel—to allow Hancock's players to have an advantage in fighting Warren's players—not Daniel, we would have to conclude that the Officers also intended for a then-unidentified Hancock player to later catastrophically injure Daniel, the Warren players' coach, when the Officers

10

pepper sprayed Warren's players. This much cannot be inferred from what is alleged in the Complaint.

And even if we were to find that Daniel successfully alleged that the Officers intended to harm Daniel specifically, under binding caselaw, we could not find that the Officers' conduct so "shocked the conscience" as to amount to a substantive-due-process violation. "The shocks-the-conscience inquiry . . . looks at the objective unreasonableness of the officers' conduct," *Tinker v. Beasley*, 429 F.3d 1324, 1328-29 (11th Cir. 2005), and whether the conduct was undertaken "maliciously and sadistically for the purpose of causing harm." *Danley v. Allen*, 540 F.3d 1298, 1306-07 (11th Cir. 2008), *overruled on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009); *Fennell*, 559 F.3d at 1217.

Only conduct that is "the most egregious conduct"—that is, conduct deliberately "intended to injure in some way unjustifiable by any government interest"—gives rise to a substantive-due-process claim. *Cty. of Sacramento*, 523 U.S. at 846, 849, 118 S. Ct. at 1716, 1718. As the Supreme Court has explained, "Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 665 (1986) (emphasis in original). Indeed, our caselaw sets a very high bar for such "conscience shocking" conduct in non-custodial settings.

11

*Dacosta v. Nwachukwa*, 304 F.3d 1045 (11th Cir. 2002), presents an example of just how high our threshold is. In *Dacosta* we found no Fourteenth Amendment claim despite a set of facts that showed clear malicious intent. *Id.* at 1049. There, the defendant-appellant, an instructor at Georgia Military college, purposefully slammed a door in a student's face, and when the student held up her arm to protect herself from the door, her arm shattered the glass window on the door and became lodged in the cracked pane. *Id.* at 1047. The instructor then violently swung the door several times in an attempt to knock the student back from the door. *Id.* After that proved unsuccessful, the instructor reached through the cracked glass pane, shoved the student's face, and tried to forcibly dislodge her arm from the window. *Id.* Several other students in the class had to physically restrain the instructor until police arrived and arrested him for criminal battery. *Id.* at 1047. This Court reversed the district court's denial of the instructor's motion to dismiss, even though it noted that the facts described the tort of intentional battery. *Id.* at 1048. As we explained, "such conduct, malicious as it may have been," did not amount to a federal constitutional violation. *Id.*

Similarly, in *Skinner v. City of Miami*, 62 F.3d 344 (11th Cir. 1995), a firefighter sued his colleagues for violating his substantive-due-process rights by hazing him in an especially degrading and humiliating fashion. *Id.* at 346. We reasoned that although "Skinner ha[d] proven that he was assaulted[,] that . . . is a

tort created by state law, and not necessarily a violation of a constitutional right." *Id.* at 347. We explained that "[t]ort law is one such area that remains largely outside the scope of substantive due process jurisprudence." *Id.*

Against this background, the Officers' use of government-issued pepper spray for the purpose of handicapping the Warren players during an altercation, while surely "untoward, unfortunate, and understandably upsetting[,]" does not state a substantive-due-process violation. *Maddox v. Stephens*, 727 F.3d 1109, 1127 (11th Cir. 2013). Daniel's injuries resulted from the Student Assailant's intentional battery, even if the Officers' pepper spraying contributed in some way to the Student Assailant's opportunity to attack Daniel. And the harm that Daniel suffered is redressable by principles firmly rooted in state tort. Daniel has filed state-law claims, and he must look to them for redress.

## V.

As for Daniel's claims against the District, they were premised on the District's alleged policies of failing to provide proper security at events and failing to properly train and supervise those who provided security for events.

In addressing this claim for municipal liability under § 1983, we must first consider whether a direct causal link exists between a municipal policy or custom and the alleged constitutional deprivation. *Collins*, 503 U.S. at 123, 112 S. Ct. at 1067; *see White*, 183 F.3d at 1259. To allege a custom or policy giving rise to a

13

substantive-due-process violation, a plaintiff must point to either an officially promulgated policy or an unofficial custom or practice of the government entity shown through the repeated acts of a final policymaker for that entity. *Grech v. Clayton Cty.*, 335 F.3d 1326, 1329-30 (11th Cir. 2003). Either way, though, a plaintiff "(1) must show that the local governmental entity . . . has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." *Id.* at 1330. We have noted that a government entity almost never will have a formal policy allowing a particular constitutional violation. *Id.* So, usually, a plaintiff must demonstrate that the government entity has a custom or practice of allowing the particular constitutional violation. *Id.* To do this, a plaintiff generally must show "'a persistent and widespread practice.'" *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994) (quoting *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986)). Indeed, the practice must be extensive enough to allow actual or constructive knowledge of such customs or policies to be attributed to the governing body of the municipality. *Id.* "'Normally random acts or isolated incidents are insufficient to establish a custom or policy.'" *Church*, 30 F.3d at 1345 (quoting *Depew v. City of St. Marys*, 787 F.2d at 1499)). Daniel did not identify a specific officially promulgated unconstitutional policy, so

14

he was required to demonstrate a custom or policy by alleging facts of a persistent and widespread practice of permitting the specific constitutional violation he alleges. He failed to do so.

### A. *Daniel did not allege facts contending that the District had a policy of failing to provide proper security*

In the Complaint, Daniel claimed that "the [] District had an inadequate number of properly trained security personnel present, did not have a security plan in place for the game and [] did not have a plan in place for the deployment of security personnel before, during or after the game." In essence, Daniel asserted that the District did not provide enough security and that the security that it did provide was not competent.

When a claim is premised on the government's failure to protect an individual not in custody, the "harm [suffered] will seldom, if ever, be cognizable under the Due Process Clause." *White*, 183 F.3d at 1258. The Supreme Court has been clear that while the Fourteenth Amendment "'forbids the State itself to deprive individuals of life, liberty, or property without "due process of law[,]" its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.'" *Collins*, 503 U.S. at 126, 112 S. Ct. at 1069 (quoting *Deshaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S. Ct. 998, 1003 (1989)). The Due Process Clause of the Fourteenth Amendment "is phrased as a limitation on the State's

15

power to act, not as a guarantee of certain minimal levels of safety and security." *Deshaney*, 489 U.S. at 195, 109 S. Ct. at 1003. It "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196, 109 S. Ct. at 1003. But where a substantive-due-process claim does arise in a non-custodial setting, it is evaluated under a "shocks the conscience" standard of review. *Nix*, 311 F.3d at 1377.

Here, on appeal, Daniel does not point to any alleged facts from his Complaint that showed that the District's failure to provide proper security was "conscience shocking." And even if we could look to his brief in the district court,[5] there, Daniel merely highlighted several actions that the District took *after* the altercation—for example, supporting and defending the Officers' conduct and filing false charges against Daniel. While we can understand how such conduct may have been upsetting and personally insulting, we cannot say that it rose to the level of "shocking the conscience" under the caselaw. *Maddox*, 727 F.3d at 1127. And the Fourteenth Amendment cannot provide relief absent "conscience-shocking" conduct. *DeShaney*, 480 U.S. at 201-02, 109 S. Ct. at 1006-07; *White*, 183 F.3d at 1258. "[A] State's failure to protect an individual against private

---

[5] We have explained many times that "a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004); *see also Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

16

violence simply does not constitute a violation of the [Substantive] Due Process Clause" otherwise. *DeShaney*, 480 U.S. at 197, 109 S. Ct. at 1004. As a result, Daniel failed to allege a Fourteenth Amendment substantive-due-process claim against the District for failing to provide proper security.

### B. Daniel failed to allege facts evidencing that the District's failure to properly train and supervise was deliberately indifferent

Daniel's Complaint alleged that the District failed to properly train and supervise the Officers and that that failure directly and proximately caused Daniel's Fourteenth Amendment constitutional deprivation. But this allegation, too, was insufficiently supported to withstand the District's motion to dismiss.

Where a government entity has a policy or custom of failing to train and supervise its employees, and that failure causes the entity's employee to violate a person's constitutional rights, the government entity may be liable. *Collins*, 503 U.S. at 123, 112 S. Ct. at 1068; *Gold v. City of Miami*, 151 F.3d 1346, 1350-51 (11th Cir. 1998).[6] We have previously noted that a government entity "is not automatically liable under section 1983 even if it inadequately trained or supervised its [] officers and those officers violated [a plaintiff's] constitutional rights. . . . [T]here are only 'limited circumstances' in which an allegation of a failure to train or supervise can be the basis for liability under § 1983." *Gold*, 151

---

[6] The rule suggested by the Supreme Court for purposes of failure to train also applies to the failure to supervise. *See Gold*, 151 F.3d at 1350-51.

F.3d at 1350 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387, 109 S. Ct. 1197, 1204 (1989)).    As the Supreme Court has explained, these "limited circumstances" arise "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388, 109 S. Ct. at 1204.[7]    Although "municipal liability requires a decision by a final policymaker[,]" *Church*, 30 F.3d at 1343, a municipality can be liable when "a series of decisions by a subordinate official manifest[s] a 'custom or usage' of which the supervisor must have been aware." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130, 108 S. Ct. 915, 928 (1988) (plurality opinion).

In order for liability to attach, however, the municipality must have had notice of a need to train or supervise in a particular area. *Gold*, 151 F.3d at 1351. Otherwise, as a matter of law, the entity cannot be liable for failure to train and supervise. *Id.*  To establish notice and deliberate indifference for purposes of failure to train, a plaintiff must "ordinarily" show "a pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S.

---

[7] The district court erred in applying the heightened "shocks the conscience" level of fault to Daniel's claims for failure to train and supervise.  Nevertheless, for the reasons explained *infra*, it correctly entered judgment for the District, so we affirm.  *See Turner v. Am. Fed'n of Teachers*, 138 F.3d 878, 880 n.1 (11th Cir. 1998) ("We must affirm the judgment of the district court if the result is correct even if the district court relied upon a wrong ground or gave a wrong reason.").

51, __, 131 S. Ct. 1350, 1360 (2011) (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 409, 117 S. Ct. 1382 (1997)).

For example, in *Brooks v. Scheib*, 813 F.2d 1191 (11th Cir. 1987), this Court held that a city lacked notice of past police misconduct where ten citizen complaints about the specific police officer at issue had been made. *Id.* at 1193. We reasoned that despite the number of complaints, the plaintiff "never demonstrated that past complaints of police misconduct had any merit" or had any relation to the specific conduct at issue so that the city "knew or should have known that the natural consequence of its policy and practices would be the deprivation of rights." *Id.*

Similarly, in *Wright v. Sheppard*, 919 F.2d 665 (11th Cir. 1990), we held that a sheriff's department was not liable for a deputy's acts where the deputy assaulted a man to settle a private debt for a third party. We found that the need for training was not "plainly obvious." *Id.* at 674. Even though the sheriff had previously heard that officers assisted in private debt collections, we concluded that there was "no evidence of a history of widespread prior abuse . . . [that] put the sheriff on notice of the need for improved training or supervision." *Id.* at 674; *see also Popham v. City of Talladega*, 908 F.2d 1561, 1564-65 (11th Cir. 1990).

Here, Daniel did not even identify a pattern of prior similar instances of alleged improper training and supervision that resulted in significant injuries to

19

people whom the District hired security to protect. Instead, Daniel asserts that his allegations concerning the existing rivalry between the two schools, the fact that it was Hancock's homecoming game, and the fact that a Warren County law-enforcement officer had made inquiries to the District about security should have put the District on "notice of its need to provide training and supervision with respect to the area of security." But these allegations did not demonstrate that the District had a previously existing problem with security it had provided at District events. There was nothing about these allegations that suggested that security that the District had arranged in the past was inadequately trained or supervised. In short, under our caselaw these allegations did not present the sort of "'continued adherence to an approach [the District] kn[e]w or should [have] know[n] . . . failed to prevent tortious conduct by employees.'" *Connick*, 131 S. Ct. at 1360 (quoting *Bryan Cty.*, 520 U.S. at 407, 117 S. Ct. at 1382).

And the Complaint had yet another flaw. Even had Daniel identified a pattern of similar conduct that should have provided notice, he still could not have cleared another hurdle: "the identified deficiency in a [] training program [and supervision] must be closely related to the ultimate injury." *City of Canton*, 489 U.S. at 391, 109 S. Ct. at 1206. So Daniel still would have had to have alleged that the training and supervision deficiency actually caused the Officers' challenged actions. To do so, Daniel would have had to have demonstrated both a link

between the District's alleged failure to train and supervise and the risk that the Officers would then pepper spray the Hancock players, on the one hand, and a link between the risk that the Officers would pepper spray the Hancock players and Daniel's specific injuries would result to Daniel, on the other. *See Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1584 (11th Cir. 1995). Daniel's Complaint failed to allege facts sufficient to establish either nexus.

Daniel's Complaint alleged only that the District's "deliberately indifferent policy, practice and custom" of failing to provide proper security, proper training, and proper supervision "was the direct and proximate cause of the . . . deprivation of [] Daniel's liberty interest in bodily integrity." It did not assert or show that, "through its *deliberate* conduct, [the District] was the 'moving force' behind the injury" caused by the Student Assailant. *Bryan Cty.*, 520 U.S., at 404, 117 S. Ct. at 1388. The absence of such allegations is independently fatal to Daniel's claim against the District. An entity is liable under § 1983 only "when the 'execution of the government's policy or custom . . . inflicts the injury.'" *Gold*, 151 F.3d at 1350. For these reasons, the district court was correct to dismiss Daniel's § 1983 claim against the District.

## V.

Next, Daniel contends that the district court abused its discretion in denying as futile his motion to amend his original complaint. Generally, Rule 15(a), Fed.

21

R. Civ. P., restricts a district court's discretion to dismiss a complaint without prejudice. *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988). We have noted that if a more carefully drafted complaint might state a claim, the district court must provide a plaintiff with at least one chance to amend the complaint before the dismissing the case with prejudice. *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991). But, among other exceptions, this rule does not apply where amendment would be futile. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001).

Here, Daniel's proposed amended complaint would have been futile for all of the reasons that we have described in this opinion. Nor, in view of the nature of the deficiencies, could better drafting have cured enough of the problems to allow Daniel to have stated a claim on these facts. Moreover, the district court evaluated Appellees' motions to dismiss against the allegations of the proposed amended complaint, effectively allowing Daniel the benefit of amending his original complaint. Under these circumstances, the district court did not abuse its discretion in denying leave to amend and dismissing the § 1983 claims with prejudice. *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004).

## VI.

Finally, Daniel appeals the district court's refusal to exercise its supplemental jurisdiction over his state-law claims and its dismissal of those

22

claims without prejudice. A district court can exercise supplemental jurisdiction over all state-law claims that arise from a common nucleus of operative facts with a substantial federal claim. *Parker*, 468 F.3d at 743. But a district court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Because the district court properly dismissed Daniel's federal claims, the district court did not abuse its discretion by declining to exercise supplemental jurisdiction. *Parker*, 468 F.3d at 738.

## V.

In short, the district court did not err in dismissing Daniel's complaint and in denying Daniel's motion to amend, and it did not abuse its discretion in refusing to exercise supplemental jurisdiction over Daniel's state-law claims. The district court's order is **AFFIRMED**.